Case number 17-2168, United States of America v. Duane Berry. Oral argument is not to exceed 15 minutes per side. Mr. Daley, you may proceed for the appellant. Good afternoon. Craig Daley on behalf of Duane Berry. I am reserving three minutes for rebuttal. Very well. In this case, I'm sorry? Go ahead. Thank you. This case involves the review of Mr. Berry's constitutional right to refuse medication and to preclude the government from taking measures to forcibly medicate him, in this case, likely by injection, to attempt to render him competent to stand trial. The government is obligated to prove the four requirements by the Supreme Court in the cell case by clear and convincing evidence. So the government has an upheld battle. And in particular, authorization for involuntary medication is disfavored by the courts. And what I'd like to do in the next few minutes is focus on the first cell requirement for two reasons. First of all, the first requirement is a legal question subject to denotable review by this court under court's decision in green. And secondly, because I believe this is our strongest argument. Under the first requirement, the government must prove an important governmental interest that is at stake. And that involves a two-step analysis. The government must show that this is a serious crime, and if so, whether or not there are special circumstances that may lessen the importance of that interest. The green case from this court directs us to two objective factors to look to see whether or not the charge that Mr. Berry is facing is a serious crime. And the two factors are the maximum statutory penalty that he faces and the guideline range. Here, Mr. Berry is faced with a crime for which he could receive up to five years in prison, so that on the continuum of possible penalties, this particular crime is clearly at the low end. It is probably the least serious of crimes for which an individual could be charged under federal law. If we look at Mr. Berry's charges relative to other Sixth Circuit cases that have dealt with this particular issue, when we look at Green, Mr. Green was charged with drug offenses that, because of the quantity involved, required a mandatory minimum of ten years up to life. Much more serious than Mr. Berry's case. In Grisby, the court was looking at a defendant who was charged with multiple bank robberies that carried a maximum of 20 years for each offense that could, under the law, even run consecutive. And in the other Sixth Circuit case, Mikulich planted some real explosives at the McNamara Building here in Detroit, and he faced a mandatory minimum of 37 years. So we can see that there is a large discrepancy between other cases that this court has heard and has affirmed forced medication in Mr. Berry's case. Mr. Daley, this is Judge Bush. If I could just interrupt you for a second. So you appear to be arguing that a five-year statutory maximum as a penalty for a charged crime makes that crime not a serious offense. That is correct, yes. That's your argument. So what would be a serious offense? How much time would you need to have as a statutory maximum for the crime to be a serious offense? I don't believe there's any bright line distinction that the court can actually draw. I can only say that in the other cases that the Sixth Circuit has addressed, they were significantly more lengthy in the maximum penalties that people face. So I think it's really a relative matter, and it depends on the continuum you draw. And with the understanding that in federal court, the maximum penalties usually range from approximately five years all the way up to life. I don't think there's any serious dispute that the five-year maximum falls at the lower end of this continuum of potential crimes. So are you arguing that there are factors other than the statutory maximum that should be considered for determining whether or not an offense is serious? Well, under Green, the two factors are the statutory maximum and the guideline range. Those are the only two factors that this circuit has agreed are important to consider, because in Green they talked about looking at objective factors rather than what a judge or any individual might think, that under any circumstance a particular crime is serious, because that can be very subjective. We can have a lot of different opinions on what we believe is serious in terms of threats to the public or to individuals. So this court, this circuit, has really limited consideration to those two factors. So I can talk for a moment about the guideline range and what I think ultimately is going to happen in this case. And this really gets to more of the special factors than it does the seriousness of the crime. Actually, they overlap to some extent. So the guideline range, according to the government, is 30 to 37 months. So I scored it a little bit lower at 27 to 33 months. I don't think that there's a big discrepancy there. But that would be primarily if Mr. Berry were to plead. But if we plow through on this case now and we get to a critical issue about how much time will Mr. Berry actually serve before he gets to trial, he was arrested on November 8, 2015. So today, on October 30, he has spent just days short of 36 months in custody. So he is right now at the very top of the guidelines that the government has calculated. So let's just take it a little bit further. Let's say that this court affirms the district court and issues an opinion to that effect. If that happens, and these are just approximate days, the court's opinion would probably be issued within 30 days. And then from that point, the government would have to have the district court judge enter an order to transport him to a facility for treatment. And that's going to be another 30 days. The actual time for transportation of Mr. Berry, based on what's happened twice before, another 30 days. So once he arrives at the facility for treatment, the district court orders for treatment for up to four months, and they could even come back and ask for some additional time. But let's just use the four-month period, and let's assume that the treatment that the government says will work, works. And at that point, the district judge will have to set a date for a competency hearing and bring in the witnesses. We're talking another 30 to 60 days. Assuming that the judge agrees that he's now competent, then they have to set a schedule for motions and for trial. We're looking at probably another 60 days. If Mr. Berry decides he wants to assert an insanity defense, he's got to be sent back. He's got to be sent back for an evaluation for insanity, a totally separate issue. That means he's got to be transported back. He's got to go back to that facility. We're probably looking at a minimum of 90 days. Depending on how that comes out, either side could ask for an independent evaluation. That would probably take at least 60 days. He's got to come back to this jurisdiction. Somebody's got to be hired and go see him. Once all that's done, then they can set a trial. The trial could be, at best, 30 days out. If he got convicted, three months for a sentence. Now we're out another 24 months. The maximum is 60. He's pushing right up against 60 months by the time he goes to trial if he was convicted. Here we have a situation that he spent so much time in pretrial detention that it's clearly possible he could exceed the statutory maximum in this case. The significance of that is not only that that is a very strong mitigating factor against this being a serious crime and forced medication, but if he hasn't completed his process in the criminal justice system within the five years, he won't be placed on supervised release. That's one of the arguments that the government has made that if he's on supervised release, he can be treated then as well. That makes this case particularly unique. Very different than any other case, I think, that has been presented to this court. The only other thing I want to address in terms of special circumstances is the possibility of civil commitment. The problem that we're having here is that there is no expert opinion at this point as to whether or not he meets the statutory requirements for civil commitment. If he was civilly committed, that would be another special circumstance that would preclude the government from seeking forceful medication. The problem that we have is under 18 U.S.C. section 4246, only the director of the facility where he is hospitalized can certify that he's mentally ill and that if he was released, he would be a danger to himself or others, or it would be a danger of serious damage to the property of another person. Judge Clay, Mr. Daly has exhausted his time. Okay. Mr. Daly, apparently you're out of time. If you want to continue, you could take some time from your rebuttal time, or you could stop now and await your rebuttal. Judge, if I could, I'd like to continue just for about one minute, and I'll wrap this argument up. Okay. You could do that, but let me ask you a question while you're at it. What would be the consequence of this panel reversing the district court? Since there are no civil commitment proceedings on the horizon, does that mean that your client would shortly perhaps be released from custody and there would be no prosecution, or what do you foresee would happen? That ball falls in the government's court. They would have to make a decision. They can't proceed against him as long as he's incompetent, which he is, and it seems likely that in that situation the government would have to move to dismiss, and then they would have to decide whether or not they would seek civil commitment. That's really a choice for them. All right. I just wanted to finish up, assuming that I answered your question. Yes, yes. Where the district court went wrong on this question of civil commitment is he only focused on whether or not Mr. Berry was dangerous to others or himself, and he clearly is not. He's been in general population, both in the federal and state system, but the statute addresses serious damage to the property of another, and I would draw your attention to the complaint that was filed in this case, and that's Record 1 at page ID 3, paragraph 6. There's an allegation there that Mr. Berry was involved in damaging property that belonged to the Bank of America at various branches and says that the estimated damage that he did was $300,000, which I think we can agree is serious damage to property. They got his license plate number at these ATM branches, and they have a statement by a relative that it was Mr. Berry who did this, which would be consistent with what he did in this case. And the district judge actually addressed this in his court order at Record 64, page ID 358, where he's talking about this damage. So in that respect, I think the district judge actually missed an important element about civil commitment and whether or not that was a special circumstance that would preclude the government from seeking forced medication. Thank you. Thank you. We'll hear from the government. Good afternoon, Your Honors. My name is Kevin Mulcahy. I represent the United States in this case. When Mr. Berry left a fake bomb outside of the Guardian building here in downtown Detroit, he evoked the fears of terrorism that are very real in our country today, and when he did so, he also committed a federal offense. The prosecution of that crime serves a variety of governmental interests, some of which relate directly to Mr. Berry, some of which relate to others besides Mr. Berry. Counsel, this is Judge Mayer. Tell me exactly who he's a danger for. I'm having a hard time seeing where he's a danger to the public. Maybe he's a danger to himself. Is that a factor? As far as being a danger to himself or the public, I think that would be a factor under one of the special circumstances that would mitigate against the governmental interest in the case. In other words, for civil commitment, as Mr. Daley was just speaking of, I think the record does not have very much information in it that shows that Mr. Berry is a danger to himself or others as far as terms of violence against other people, and that's why the government believes and the district court ruled that he was not a good candidate for civil commitment. But as far as the first factor under sell, the seriousness of the governmental interest here, it's not that he's a danger to the public. That's not the governmental interest at stake as much as first would be, as it relates to Mr. Berry, is a punishment for the crime he committed, which, as Mr. Daley has indicated, he has served. Next week it will be 36 months that Mr. Berry will have been in custody against a guideline range of 30 to 37 months. And so while he's served most of his guideline range time, that's not the only consideration. It's not merely a math problem here. There's other considerations when we evaluate the sell factor, the first sell factor. For example, the need for a period of supervised release. And Mr. Daley suggests in his argument that there wouldn't be a period of supervised release because this case would take another two years. I don't think there's real evidence of that. When Mr. Berry comes back, if this court were to affirm the district court's order and he would be sent back to Butner to be medicated, the court's order is limited to four months' worth of treatment. So even if there is a period of time for transporting Mr. Berry, within the next four to six months Mr. Berry will be back in Detroit either competent and the case can proceed to trial, and I'm certain that the district court will want it to proceed quickly, or the medication will not have worked and Mr. Berry will continue to be not competent to stand trial and the case will have to be dismissed. Counsel, this is Judge Merrigan. So under the first sell factor you don't find that he's a danger to the community, to others. So there's no deterrent reason to hold him under that supposition, right? Well, I would agree with one point, but I want to add a point of clarification, which is the first sell factor is not whether Mr. Berry is a danger to the community. The first sell factor is what is the governmental interest at stake here, and that governmental interest is whether the seriousness of the offense, and that's measured by, as Mr. Daley said, the statutory maximum in this case, which is five years in custody. And as far as deterrence goes, that's another factor that underscores the significance of the governmental interest in this case. It's not merely specific deterrence as to Mr. Berry. In other words, putting Mr. Berry in a form of punishment for a certain period of time, that is not the sum of the governmental interest in this case. If it were, I would agree with Your Honor that the government argument is very weak here, but the governmental interest goes on beyond merely punishing Mr. Berry for his offense. It includes putting Mr. Berry on a period of supervised release. That period of supervised release in this case can be up to three years, and the government's position and the district court agreed is that it is vital for someone like Mr. Berry, who is battling a mental illness, to be monitored as he's released into the community, because while we don't have evidence in the record that Mr. Berry is a danger to the community necessarily, he's certainly a problem for Bank of America and for the courts, as he has written countless letters. What is the problem for Bank of America? That is why, what should the Bank of America be worried about and concerned about with respect to this guy? The Bank of America should be concerned about Mr. Berry continuing to send threatening and hostile letters to its different branches. He has sent mailings even since he's been in prison to the Bank of America, and obviously when he left this bomb in downtown Detroit, he did so right outside of a branch of a Bank of America there in Detroit. So that building that he left the bomb out in front of was in front of a Bank of America branch. His dispute with Bank of America, as it is, is that he believes he owns the bank, and so he is taking steps to, in his words, foreclose on the bank. And so from Bank of America's perspective, as the victim in this case, they have concerns about continuing to receive threatening messages from Mr. Berry that go beyond property damage but stoke real fear in the different branches that have received mailings from, threatening mailings from Mr. Berry. What you're now saying is he, they might consider him a threat, even though the bomb was a fake, and he's never done anything that was other than a kind of a silly fake in connection with Bank of America. That would be true, right? He hasn't really done anything other than something that is a fake. Isn't that right? That's right. Everything he's done has been a threat, although I don't think it could be characterized as silly. When he left that bomb-looking device, exited his SUV, dropped the device, and took off in his car, it stoked real fear among the people on the street outside of that Bank of America branch. And I think that while he hasn't committed acts of violence against individuals that work for Bank of America, he has certainly escalated his dispute with Bank of America from filing liens to filing lawsuits. He's escalated it to acts of vandalism, and then ultimately into planning this fake bomb. What you're saying is that we should consider that kind of conduct on this part to be possibly continuing, and that is a sufficient interest of the government to deter, to make this first fell interest. That's what you're saying, basically. Yes, Your Honor, I think that's right. But beyond Mr. Berry, the other governmental interests in this case have to do with other individuals who would escalate a dispute, whether it be with a corporation or an individual or a group of people or a governmental entity. When they would escalate a dispute to do something like commit a crime like Mr. Berry did, there is a general deterrence that is important governmental interest in this case as well, letting like-minded individuals know that there will be a consequence, and the government will see a prosecution through to the end for an individual who evokes and exploits the fears of terrorism in a dispute that he or she may have with some other party. Mr. Mulcahy, this is Judge Bush again. I'm still trying to figure out what the lower end is of the statutory time in prison for what is a serious offense and what is not. The government is arguing here that five years is, I guess, in combination with a period of supervised release constitutes a serious offense. Where does it become a non-serious? At what level would you say we draw the line for when we have a non-serious offense? I think where we draw the line would be a combination of the statutory maximum with an evaluation of the facts of a particular case. I could foresee a case where a five-year statutory maximum would not necessarily meet the first cell factor if that offense was deemed not serious. However, the courts that have evaluated five-year statutory maximum claims, both the Sixth Circuit in an unpublished opinion called Dillinger, as well as its sister circuits in a variety of threat cases, have found that in the threat context, a five-year statutory maximum is sufficiently serious to meet the first cell factor. I think I don't know where the bottom line is. In that way, I agree with Mr. Daley that it's more than just a math problem. It's more than just a period of years, but rather a combination of the facts of a particular case plus the statutory maximum. In the threat context, the cases that are cited by the government show that a five-year statutory maximum in the threat context is sufficiently serious to meet the threshold of the first cell factor. The last part about that first factor of this analysis, and frankly this is where this case rises and falls, is the first factor under cell, and specifically the special circumstances that include whether or not the defendant has served most or all of his time. That takes away from the significance of the governmental interest. While we concede and understand that, the other governmental interests here go to not only the supervision of Mr. Berry, which I spoke of earlier, but also the general deterrence and the victims having their day in court and the justice that's due to them having been victimized by Mr. Berry's conduct. That's specifically the Bank of America, and I suppose any person who was on the street that day, although those victims may not be known, certainly the Bank of America has endured a lot of threats from Mr. Berry. There are a variety of things at stake here as far as the governmental interests are concerned. Aren't we precluded by the Mikulich case from considering special circumstances? You seem to be arguing special circumstances. I don't read the Mikulich cases. I think the Supreme Court has said that the court should consider special circumstances. Okay. That's to find if there's not a serious offense. That's a mitigating circumstance, correct? Exactly right, yes. Okay. You're arguing exacerbating circumstances, are you? Correct. As we look at the governmental interest at stake, that amount of mitigation that comes from the amount of time a defendant has served, so in this case Mr. Berry has served virtually all of the time called for by the guideline range, how mitigating a factor is that under the special circumstances has to be weighed against the facts of the case. The Ninth Circuit's case that the government cited called ANOHA is a mirror image of Mr. Berry's case. In that case the defendant, again, stoked fears of terrorism, had already served virtually all of his time called for by the guideline range, but still the Ninth Circuit said that the first factor had been met because even though the defendant had served all of his time called for by the guidelines, the evoking of the fears of terrorism and the need to deter others overcame that special circumstance, that mitigating fact of the amount of time served by the defendant in that case. And that's our argument here is that the seriousness of the other governmental interests overcome this mitigating factor of the amount of time Mr. Berry has already served in custody. And you don't think ANOHA conflicts with Mikulik in its approach? No, Your Honor. I think Mikulik's – the key point in Mikulik was that his – the amount of time that he was facing in custody was enormous. It's 37 years of mandatory minimum time up to life, and so he didn't have the argument that Mr. Berry or Mr. ANOHA had that they had served most of their time. He couldn't make that argument. Instead, I think his focus had to be on whether or not he would win an insanity defense or be civilly committed. And while he had facts there because he had left a real bomb outside of a building as opposed to a fake bomb, he had more facts to point to to say, you know, I may in fact be civilly committed. Mr. Berry just doesn't have those facts. And, you know, Mr. Daley, when he talks about the civil commitment, this court should look at the Mikulik case, which says it joined its sister circuits, Sixth Circuit did, it joined its sister circuits in holding that the government's interest in prosecution is not diminished if the likelihood of civil commitment is uncertain. And that's at page 699 of that case. And here the possibility of civil commitment is uncertain, and so it doesn't cut, it doesn't diminish the government's interest in prosecution in this case. And so because the offense is serious, because the special circumstances don't amount to enough mitigation to take away from that seriousness, the district court's order should be affirmed on the first cell factor. And unless there are other questions from the court. Apparently not. We can hear rebuttal if Mr. Daley has any rebuttal. Two minutes, Your Honor. I do, just briefly, if I may. I think Mr. O'Keefe has a very difficult argument to make. As I was listening to him, I thought he was dancing between the raindrops on the question that Judge Merritt raised about dangerousness. On the one hand, the government is saying he's not a danger to the public. It really goes to the issue of seriousness. At the same time, I think he doesn't want to really concede it because it also goes to the question of civil commitment. If Mr. McCauley was to say he was a danger, then the likelihood of civil commitment is more prominent. So I think he's got a very difficult dance to do here. The second thing, when he talked about punishment and deterrence, we know that Mr. Berry has served the upper end of the guidelines. And in this district, most guilties are capped at mid-range. He has been punished sufficiently for his crime. And in terms of deterrence, most of these cases involve people who are mentally ill. And I think it's very suspect to think that if Mr. Berry was convicted and word got out, which I don't believe it would, that people who have these mental problems would be deterred. I think that that is unlikely. And I think the one thing that Mr. Mulcahy did admit, that this case is different than the Mokulich case, but he used the word device in talking about what Mr. Berry put outside the Guardian building. It was not a device. It was not capable. There was nothing exclusive in it at all. And so that's an important distinction. And when he talks about victims, I can tell you that when he put this package and he put the white plastic over it, I watched my office from the eighth floor. Technically, I guess I would be a victim, but I can tell you that I did not have any apprehension and I watched everything that happened. That's a little sidebar there. As far as other jurisdictions are concerned and his reliance on the Ninth Circuit case, the Onoha case, the penalty there was ten years, which is substantially more than what Mr. Berry faces in this case. Are there any questions? I guess there are not any questions. Does that complete your argument? It does. Thank you. All right. Well, in that case, the case is submitted, and I guess the judges can retire from counsel to discuss the matter. Shelby? Thank you very much. Thank you, Your Honors. Yes, sir. If you can just confirm once the attorneys have disconnected. Both attorneys are disconnected. Okay. Thank you.